**[Cite as *In re X.S.*, 2021-Ohio-1774.]**

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### MERCER COUNTY

IN RE:

    X.S.,                                CASE NO.  10-20-09

DEPENDENT CHILD.

                                             O P I N I O N

[GABRIEL S. - APPELLANT]
[AMANDA T. - APPELLANT]

IN RE:

    M.S.,                                CASE NO.  10-20-10

DEPENDENT CHILD.

                                             O P I N I O N

[GABRIEL S. - APPELLANT]
[AMANDA T. - APPELLANT]

IN RE:

    G.S.,                                CASE NO.  10-20-11

DEPENDENT CHILD.

                                             O P I N I O N

[GABRIEL S. - APPELLANT]
[AMANDA T. - APPELLANT]

**IN RE:**

    **S.S.,**                                            **CASE NO.  10-20-12**

**DEPENDENT CHILD.**

                                                    **O P I N I O N**

**[AMANDA T. - APPELLANT]**

**IN RE:**

    **W.S.,**                                            **CASE NO.  10-20-13**

**DEPENDENT CHILD.**

                                                    **O P I N I O N**

**[AMANDA T. - APPELLANT]**

**Appeals from Mercer County Common Pleas Court**
**Juvenile Division**
**Trial Court Nos. 32019041, 32019043, 32019044, 32019051, and 32019050**

**Judgments Affirmed**

**Date of Decision:   May 24, 2021**

**APPEARANCES:**

    *Peter R. VanArsdel* **for Appellant, Gabriel S.**

    *Gloria A. Dicke* **for Appellant, Amanda T.**

    *Andrew J. Hinders* **for Appellee**

Case No. 10-20-09, 10, 11, 12, 13

**MILLER, J.**

{¶1} Father-appellant, Gabriel S., appeals the October 1, 2020 judgments of the Mercer County Court of Common Pleas, Juvenile Division, granting permanent custody of three of his children to appellee, Mercer County Department of Job and Family Services ("MCDJFS"). Mother-appellant, Amanda T., appeals the same court's October 1, 2020 judgments granting MCDJFS permanent custody of her five children, three of whom she shares with Gabriel. For the reasons that follow, we affirm.

## I. Facts and Procedural History

{¶2} Gabriel and Amanda are the biological parents of X.S., born 2015, M.S., born 2013, and G.S., born 2012. In April 2017, X.S., M.S., and G.S. were placed in MCDJFS's custody after Gabriel "overdosed on an illegal drug, and [Amanda] was found to have used illegal drugs." On June 27, 2017, X.S., M.S., and G.S. were adjudicated neglected and dependent in case number 32017016. By judgment entry dated July 14, 2017, X.S., M.S., and G.S. were continued in the temporary custody of MCDJFS.[1]

---

[1] The complaints filed in case number 32017016, as well as the judgment entries of adjudication, the judgment entries of disposition, and other filings from that case, are absent from the record currently before us. The available record begins with documents file-stamped on May 17, 2019.

-3-

{¶3} In 2019, Amanda gave birth to twin boys, S.S. and W.S. Gabriel is not the biological father of the boys. S.S. and W.S.'s biological father, Phillip S., is not a party to this appeal.

{¶4} On July 3, 2019, MCDJFS refiled complaints in the trial court alleging that X.S., M.S., and G.S., who had been in the temporary custody of MCDJFS without interruption since April 2017, were neglected and dependent children. The complaints also included requests for permanent custody of X.S., M.S., and G.S.

{¶5} An initial hearing was held on July 8, 2019, at which the magistrate continued X.S., M.S., and G.S. in the temporary custody of MCDJFS. The trial court adopted the magistrate's order on July 10, 2019.

{¶6} An adjudicatory hearing was held on August 13, 2019. At the hearing, Gabriel and Amanda proposed that they would stipulate to findings of dependency. In exchange, MCDJFS agreed to withdraw its requests for permanent custody of X.S., M.S., and G.S. MCDJFS also agreed that if the trial court found X.S., M.S., and G.S. to be dependent, a case plan would be prepared giving Amanda temporary custody of the children. The trial court approved the parties' proposal and found X.S., M.S., and G.S. to be dependent children as alleged in the complaints. The trial court then proceeded to conduct a dispositional hearing, at which the trial court received evidence that Amanda had tested negative for drugs of abuse for the previous year, that she maintained custody of S.S. and W.S., that she was employed,

and that she was seeking a permanent residence. Based on this evidence, the trial court ordered X.S., M.S., and G.S. to be placed in Amanda's temporary custody. MCDJFS was granted protective supervision of the children. In addition, the trial court adopted an amended case plan, Case Plan 1.02. The trial court filed its judgment entries of disposition on August 22, 2019.

{¶7} On August 22, 2019, MCDJFS filed complaints in the trial court alleging that S.S. and W.S. were neglected or dependent children. The complaints included requests for permanent custody of S.S. and W.S. To support its complaints, MCDJFS alleged that Amanda was found to be under the influence of drugs on or about August 21, 2019, that she refused to comply with court-ordered drug testing, and that "at the time, [Amanda] was residing with the child[ren] in a homeless shelter with no other adult present to care for the child[ren]."

{¶8} That same day, MCDJFS filed motions for ex parte predispositional orders requesting that S.S. and W.S. be placed in the custody of MCDJFS pending a hearing. In addition, motions were filed requesting that X.S., M.S., and G.S. be returned to MCDJFS's custody pending a hearing. The trial court granted MCDJFS's motions, and all five children were placed in the custody of MCDJFS pending further hearing. Later that day, the trial court conducted a shelter-care hearing. By judgment entries dated September 9, 2019, the trial court ordered that all five children be placed in the temporary custody of MCDJFS.

{¶9} An adjudicatory hearing was held on October 11, 2019, to determine whether S.S. and W.S. were neglected or dependent children. Based on the evidence presented at the hearing, the trial court determined that S.S. and W.S. were dependent children, and it continued S.S. and W.S. in the temporary custody of MCDJFS. The trial court filed its judgment entries of adjudication on October 21, 2019.

{¶10} A dispositional hearing was held on October 21, 2019. At the hearing, MCDJFS withdrew its requests for permanent custody of S.S. and W.S. and asked that S.S. and W.S. be continued in the temporary custody of MCDJFS. The trial court continued S.S. and W.S. in the temporary custody of MCDJFS. The trial court filed its judgment entries of disposition on October 28, 2019.

{¶11} At the same dispositional hearing, the trial court also reviewed X.S.'s, M.S.'s, and G.S.'s prior dispositions. The trial court continued X.S., M.S., and G.S. in the temporary custody of MCDJFS.

{¶12} On October 29, 2019, MCDJFS filed a motion to approve and adopt amendments to Case Plan 1.02. A case plan review hearing was held on November 5, 2019. Gabriel did not attend this hearing. However, his attorney orally objected to portions of the proposed amended case plan. The trial court overruled the objections. On November 22, 2019, the amended case plan, designated Case Plan 1.03, was approved and journalized in X.S.'s, M.S.'s, and G.S.'s cases. Case Plan

Case No.  10-20-09, 10, 11, 12, 13

1.03 was approved and journalized in S.S.'s and W.S.'s cases on November 26, 2019.

{¶13} On April 20, 2020, MCDJFS filed motions for permanent custody of all five children.  A permanent-custody hearing was held on July 29-30, 2020.  On October 1, 2020, the trial court granted MCDJFS's motions for permanent custody.

## II.  Assignments of Error

{¶14} On October 21, 2020, Gabriel filed a notice of appeal.  He raises the following two assignments of error for our review:

> **1.    The trial court erred in not following the mandates of O.R.C. 2151.412 in response to objections to the case plan.**
>
> **2.    The agency failed to use reasonable efforts to reunify Gabriel S. with his children.**

{¶15} On October 26, 2020, Amanda filed her own separate notice of appeal. She raises the following two assignments of error for our review:

> **1.    The trial court's judgment in granting permanent custody was against the manifest weight of the evidence and contrary to law.**
>
> **2.    The trial court's decision of granting permanent custody to the Department should be overruled because the case plan was fatally defective and not in accordance with the Ohio Revised Code.**

{¶16} We will first address Amanda's two assignments of error, followed by Gabriel's two assignments of error.

Case No. 10-20-09, 10, 11, 12, 13

### III. Discussion

**A.  Amanda's First Assignment of Error:  Is the trial court's decision to award permanent custody of Amanda's five children to MCDJFS against the manifest weight of the evidence?**

{¶17} In her first assignment of error, Amanda argues that the trial court's decision to grant permanent custody of her five children to MCDJFS is against the manifest weight of the evidence.  Specifically, Amanda challenges the trial court's determinations that her children cannot be placed with her within a reasonable time.

**i.  Manifest-Weight Review of Permanent-Custody Decisions**

{¶18} "When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court '"weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered."'" *In re Dn.R.*, 3d Dist. Shelby No. 17-20-06, 2020-Ohio-6794, ¶ 16, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115 (9th Dist.2001).

{¶19} In a permanent-custody case, the ultimate question for a reviewing court is "whether the juvenile court's findings * * * were supported by clear and convincing evidence." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 43.

"Clear and convincing evidence" is the "'measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.'" *In re Dn.R.* at ¶ 17, quoting *In re Estate of Haynes*, 25 Ohio St.3d 101, 104 (1986). "In determining whether a trial court based its decision upon clear and convincing evidence, 'a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof.'" *Id.* at ¶ 18, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990). "Thus, if the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence." *In re R.M.*, 4th Dist. Athens Nos. 12CA43 and 12CA44, 2013-Ohio-3588, ¶ 55.

{¶20} "Reviewing courts should accord deference to the trial court's decision because the trial court has had the opportunity to observe the witnesses' demeanor, gestures, and voice inflections that cannot be conveyed to us through the written record." *In re S.D.*, 5th Dist. Stark No. 2016 CA 00124, 2016-Ohio-7057, ¶ 20. "A reviewing court should find a trial court's permanent custody decision against the

manifest weight of the evidence only in the "'"exceptional case in which the evidence weighs heavily against the [decision]."'" *In re Dn.R.* at ¶ 19, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

**ii.     Standards and Procedures for the Termination of Parental Rights**

**{¶21}** The right to raise one's child is a basic and essential right. *In re Murray*, 52 Ohio St.3d 155, 157 (1990), citing *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208 (1972) and *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625 (1923). "Parents have a 'fundamental liberty interest' in the care, custody, and management of the child." *Id.*, quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388 (1982). However, the rights and interests of a natural parent are not absolute. *In re Thomas*, 3d Dist. Hancock No. 5-03-08, 2003-Ohio-5885, ¶ 7. These rights may be terminated under appropriate circumstances and when the trial court has met all due process requirements. *In re Leveck*, 3d Dist. Hancock Nos. 5-02-52, 5-02-53 and 5-02-54, 2003-Ohio-1269, ¶ 6.

**{¶22}** "R.C. 2151.414 outlines the procedures that protect the interests of parents and children in a permanent custody proceeding." *In re N.R.S.*, 3d Dist. Crawford Nos. 3-17-07, 3-17-08 and 3-17-09, 2018-Ohio-125, ¶ 12, citing *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, ¶ 26. "When considering a motion for permanent custody of a child, the trial court must comply with the statutory

requirements set forth in R.C. 2151.414." *In re A.M.*, 3d Dist. Marion No. 9-14-46, 2015-Ohio-2740, ¶ 13. "R.C. 2151.414(B)(1) establishes a two-part test for courts to apply when determining whether to grant a motion for permanent custody: (1) the trial court must find that one of the circumstances in R.C. 2151.414(B)(1)(a)-(e) applies, and (2) the trial court must find that permanent custody is in the best interest of the child." *In re Y.W.*, 3d Dist. Allen No. 1-16-60, 2017-Ohio-4218, ¶ 10. When determining whether permanent custody is in the best interest of the child, the trial court must consider the factors listed in R.C. 2151.414(D)(1), as well as all other relevant factors. *In re N.R.S.* at ¶ 15.

{¶23} Although Amanda mentions the children's "best interest" at various points in her appellate brief, her brief does not include any specific references to the best-interest factors set forth in R.C. 2151.414(D)(1) or any argument that the evidence weighs against the trial court's findings that permanent custody is in the children's best interest. She offers nothing more than conclusory statements that permanent custody is not in the children's best interest. Therefore, because Amanda does not take issue specifically with the trial court's best-interest findings, we will focus solely on whether the record supports the trial court's findings under R.C. 2151.414(B)(1)(a)-(e). *See In re C. Children*, 1st Dist. Hamilton Nos. C-190650 and C-190682, 2020-Ohio-946, ¶ 9, citing *In re S.C.*, 9th Dist. Summit No. 27676, 2015-Ohio-2623, ¶ 28.

{¶24} As relevant to this case, R.C. 2151.414(B)(1) provides:

[T]he court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to [R.C. 2151.414(A)], by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

* * *

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *.

R.C. 2151.414(B)(1)(a), (d). The findings under R.C. 2151.414(B)(1)(a) and 2151.414(B)(1)(d) are alternative findings and each is independently sufficient to use as a basis for granting a motion for permanent custody. *In re M.R.*, 3d Dist. Defiance No. 4-12-18, 2013-Ohio-1302, ¶ 80.

{¶25} "Specifically concerning R.C. 2151.414(B)(1)(a), '[i]f one or more of the factors enumerated in R.C. 2151.414(E) is found to be present by clear and convincing evidence, the trial court shall find that the child cannot be placed with the parents within a reasonable period of time or should not be placed with the parents.'" *In re A.M.*, 2015-Ohio-2740, at ¶ 13, quoting *In re A.F.*, 3d Dist. Marion

Case No. 10-20-09, 10, 11, 12, 13

No. 9-11-27, 2012-Ohio-1137, ¶ 54. Pertinent to this case, a trial court shall find that a child cannot be placed with a parent within a reasonable period of time or should not be placed with the parent if the trial court determines by clear and convincing evidence that

> [f]ollowing the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

R.C. 2151.414(E)(1).

### iii. The trial court's decision to award permanent custody of the children to MCDJFS is not against the manifest weight of the evidence.

{¶26} In its judgment entries granting permanent custody of X.S., M.S., G.S., S.S., and W.S. to MCDJFS, the trial court made the following findings under R.C. 2151.414(B)(1):

> The children have been in the custody of the Department twelve or more months of a consecutive twenty-two month period. During that period, [Amanda] had the children in her custody for less than ten days before the children were removed once again during an emergency hearing due to her inability to care for all five young children.
>
> * * *

-13-

The court does find that * * * X.S., M.S., and G.S. have been in the custody of the Department for in excess of 12 out of 24 [sic] months and that * * * W.S. and S.S. have been in the custody of the Department since August of 2019.

* * *

[Amanda] has shown interest and desire to have her children and she appears to love them. She has taken advantage of services offered by the Department that she considers important to herself. However, she has not shown the ability to put her children above her emotional needs for a very long time. She is still facing the issue that led to the children's removal in the first place. Her lapses with serious drugs have occurred even when [she] is aware a permanent custody motion is pending. While the court is aware of what she has accomplished, it is very aware of what she has not. She cannot provide a safe, secure environment for the children within a reasonable time despite the amount of time that has elapsed and the services that have been offered. She still feels that these issues are just mistakes that should not count. The children have waited long enough.

After reviewing the record, we conclude that clear and convincing evidence supports these findings.

**a.      X.S., M.S., and G.S. have been in MCDJFS's temporary custody for 12 or more months of a consecutive 22-month period.**

{¶27} As indicated above, Amanda argues that the trial court's decision to grant permanent custody to MCDJFS is against the manifest weight of the evidence because the record does not support the trial court's determinations under R.C. 2151.414(B)(1)(a) that the children cannot be placed with her within a reasonable time. However, with respect to X.S., M.S., and G.S., we need not consider whether the trial court correctly determined that they cannot be placed with Amanda within

-14-

a reasonable time. It is undisputed that X.S., M.S., and G.S. were first removed from Amanda's custody in April 2017. It is also undisputed that aside from a brief period in August 2019 when X.S., M.S., and G.S. were temporarily returned to Amanda's custody, they remained in MCDJFS's temporary custody without interruption through the filing of the motions for permanent custody in April 2020.

{¶28} Therefore, the record clearly and convincingly supports the trial court's findings under R.C. 2151.414(B)(1)(d) that X.S., M.S., and G.S. have been in MCDJFS's temporary custody for 12 or more months of a consecutive 22-month period. Consequently, because the trial court's R.C. 2151.414(B)(1)(d) findings were sufficient to support the first part of the permanent-custody test as to X.S., M.S., and G.S., we need not consider the trial court's findings under R.C. 2151.414(B)(1)(a) as they relate to X.S., M.S., and G.S. *In re T.W.*, 10th Dist. Franklin Nos. 10AP-897, 10AP-898 and 10AP-899, 2011-Ohio-903, ¶ 52. As the record supports the trial court's findings under R.C. 2151.414(B)(1)(d), the trial court's decision to grant permanent custody of X.S., M.S., and G.S. to MCDJFS is not against the manifest weight of the evidence.

**b. Clear and convincing evidence supports that S.S. and W.S. cannot be placed with Amanda within a reasonable time due to her recurring drug use.**

{¶29} In its October 1, 2020 judgment entries awarding permanent custody of S.S. and W.S. to MCDJFS, the trial court noted that S.S. and W.S. had been in MCDJFS's custody since August 2019. However, in contrast to X.S.'s, M.S.'s, and

G.S.'s cases, R.C. 2151.414(B)(1)(d) could not be used to support the first part of the permanent-custody test as to S.S. and W.S. "[B]efore a public children-services agency * * * can move for permanent custody of a child on R.C. 2151.414(B)(1)(d) grounds, the child must have been in the temporary custody of an agency for at least 12 months of a consecutive 22-month period." *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, ¶ 26. "In other words, the time that passes between the filing of a motion for permanent custody and the permanent-custody hearing does not count toward the 12-month period set forth in R.C. 2151.414(B)(1)(d)." *Id.* At the time that MCDJFS filed its motions for permanent custody of S.S. and W.S. on April 20, 2020, S.S. and W.S. had not yet been in MCDJFS's temporary custody for 12 months. As a result, we must consider Amanda's argument that clear and convincing evidence does not support the trial court's findings under R.C. 2151.414(B)(1)(a) that S.S. and W.S. cannot be placed with her within a reasonable time.

{¶30} In its motions for permanent custody of S.S. and W.S., MCDJFS argued that the trial court could use either R.C. 2151.414(E)(1) or 2151.414(E)(4) to support findings that S.S. and W.S. cannot be placed with Amanda within a reasonable time. Although the trial court did not specifically cite R.C. 2151.414(E)(1) in its judgment entries, it is evident that the trial court determined that S.S. and W.S. cannot be placed with Amanda within a reasonable time because,

notwithstanding the case-planning services that MCDJFS offered to Amanda, Amanda was unable to substantially remedy the condition that caused S.S. and W.S. to be removed from her custody. The condition that caused S.S. and W.S. to be removed from Amanda's custody was Amanda's drug use. Therefore, in determining whether clear and convincing evidence supports the trial court's findings that S.S. and W.S. cannot be placed with Amanda within a reasonable time, we must examine the evidence relating to (1) the services MCDJFS provided to Amanda to help her address her drug use and (2) Amanda's progress in overcoming her substance-use problems.

{¶31} At the permanent-custody hearing, Amanda testified she first began some sort of drug counseling in 2017 when X.S., M.S., and G.S. were removed from her custody. Amanda testified that MCDJFS wanted her to complete a drug assessment through Foundations Behavioral Health Services ("Foundations"). (July 30, 2020 Tr. at 289). She stated that she did "a little bit of counseling" at a facility in Van Wert and she acknowledged that she was "exposed" to counseling beginning in 2017, but she testified that she "never followed through and completed it." (July 30, 2020 Tr. at 289-290).

{¶32} Nevertheless, Amanda did eventually find a program to help her address her drug use, though it does not appear that MCDJFS referred her to the program. Amanda testified she was in "active addiction" when she discovered she

was pregnant with S.S. and W.S.  (July 30, 2020 Tr. at 287).  In an effort to retain custody of S.S. and W.S. and to recover from her addiction, Amanda began working with Brianna's Hope, a Christian-based substance abuse recovery program, at the House of Hope in Celina.  (July 30, 2020 Tr. at 198-199, 287).  Amanda stated she took advantage of the outpatient treatment program offered at House of Hope.  (July 30, 2020 Tr. at 288).  In addition, before Amanda moved into a shelter in Celina, she lived briefly with one of the House of Hope's team members, who served as an additional resource for Amanda and who tried to support Amanda through stressful life events.  (July 30, 2020 Tr. at 200, 223-226).

{¶33} As of the summer of 2019, Amanda's efforts appeared to be paying off.  At the August 13, 2019 dispositional hearing, the trial court found that Amanda had tested negative for drugs of abuse for an entire year.  Indeed, drug-testing results admitted as evidence at the permanent-custody hearing demonstrate that Amanda consistently tested negative for illegal drugs throughout July 2019.  (Joint Ex. 2).

{¶34} However, Amanda could not maintain her sobriety.  On August 21, 2019, Amanda appeared intoxicated and refused to submit to drug screening.  While Amanda did not test positive for illegal drugs when she finally submitted to testing on August 22, 2019, and while she regularly tested negative for illegal drugs for the next month and a half, Amanda began periodically testing positive for illegal drugs beginning in October 2019.  (Joint Exs. 1, 2).  Amanda tested positive for morphine

and THC on October 3, 2019. (Joint Ex. 1). Then, on December 26, 2019, Amanda tested positive for cocaine, amphetamine, and methamphetamine. (Joint Ex. 1). On March 14, 2020, Amanda tested positive for cocaine, amphetamine, methamphetamine, and THC. (Joint Ex. 1). Finally, on April 24, 2020, Amanda tested positive for amphetamine and methamphetamine. (Joint Ex. 1). At the permanent-custody hearing, Amanda drew a correlation between stressful events in her life, such as missing Christmas with her children and her children's birthdays, and the drug use that resulted in these positive tests. (July 30, 2020 Tr. at 252-253).

{¶35} Carrie Hammersley, a caseworker for MCDJFS, testified that after the five children were removed from Amanda's custody following the August 21, 2019 incident, she suggested that Amanda enter an inpatient drug treatment program. (July 29, 2020 Tr. at 89-91). Hammersley stated that she also recommended inpatient treatment to Amanda in December 2019 after Amanda tested positive for cocaine, amphetamine, and methamphetamine. (July 29, 2020 Tr. at 90-91). However, according to Hammersley, Amanda declined on both occasions to enter an inpatient treatment program. (July 29, 2020 Tr. at 125). Hammersley testified that Amanda was not receptive to inpatient treatment because "[s]he didn't feel that she had that much of a problem, she wasn't using every day, it was, you know, under stress." (July 29, 2020 Tr. at 125-126). She also indicated that Amanda was worried

that if she entered inpatient treatment in December 2019, she would not be able to work and pay her bills. (July 29, 2020 Tr. at 134).

{¶36} Although Amanda did not enter an inpatient treatment program, MCDJFS did provide Amanda with counseling and therapy services through Foundations. Amanda started therapy with Skylar Howell, a home-based therapist with Foundations, in October 2019. (July 29, 2020 Tr. at 156); (July 30, 2020 Tr. at 246). While Howell's services were not directed specifically at addressing Amanda's drug use, Howell testified that she would talk to Amanda about her drug use, the barriers to her sobriety, and her plans for staying sober. (July 29, 2020 Tr. at 167). Amanda testified that Howell "touched on the addictions therapy while she was doing it" and that they "mainly talked more about addiction." (July 30, 2020 Tr. at 245-246). Yet, Howell eventually concluded that targeted drug counseling would better suit Amanda's needs. Thus, in June 2020, Howell discharged Amanda from home-based therapy and referred her to Cristina Lim, a substance abuse and mental health counselor at Foundations. (July 29, 2020 Tr. at 158, 188, 190). According to Howell, Amanda was receptive to drug counseling, and Amanda testified that, as of the date of the permanent-custody hearing, she had been working with Lim for a little over a month. (July 29, 2020 Tr. at 164); (July 30, 2020 Tr. at 244). Lim testified that she had met with Amanda three times as of the date of the permanent-custody hearing but that she had yet to complete a full assessment of

Amanda's substance-abuse issues. (July 29, 2020 Tr. at 191-192). When asked how long it would take for Amanda to overcome her substance-abuse issues, Lim declined to give an estimate and stated that "[i]t's different for different individuals." (July 29, 2020 Tr. at 196).

{¶37} In addition to the Foundations counselors that MCDJFS made available to Amanda, the record reflects Amanda utilized other counseling services between August 2019 and the date of the permanent-custody hearing. After receiving a referral from the shelter at which she was staying, Amanda started counseling at Momentum Counseling and Consultation ("Momentum") in late August 2019. (July 29, 2020 Tr. at 34); (July 30, 2020 Tr. at 28). Amanda did not receive specialized substance-abuse counseling at Momentum, and Amanda's counselors at Momentum ultimately referred her to an addiction specialist. (July 29, 2020 Tr. at 46, 144). Amanda stopped attending counseling appointments at Momentum at the end of December 2019. (July 29, 2020 Tr. at 34, 142).

{¶38} In their testimonies at the permanent-custody hearing, Amanda's various counselors had similar assessments of Amanda's progress in and attitude toward counseling. Although Amanda's counselors at Momentum testified that Amanda had not completed all of their counseling goals for her, they each testified that they were satisfied with Amanda's progress at the time their relationships with Amanda ended. (July 29, 2020 Tr. at 38-39, 42, 143, 146). In addition, Howell and

Amanda's counselors at Momentum all stated that Amanda attended the majority of her scheduled appointments, that Amanda had a good attitude about counseling, and that Amanda was honest and engaged during counseling. (July 29, 2020 Tr. at 36-37, 42, 141, 146, 159, 165). Lim testified that Amanda had a good attitude about drug counseling and was forthcoming during sessions. (July 29, 2020 Tr. at 202). Lim believed that Amanda would be cooperative in drug counseling going forward. (July 29, 2020 Tr. at 202).

{¶39} For her part, Amanda indicated she planned to continue drug counseling with Lim and that she was already benefitting from the counseling. (July 30, 2020 Tr. at 245). She stated that she does not want to continue using drugs and that, through counseling, she is trying to change her behaviors and become the best mother she can be. (July 30, 2020 Tr. at 254, 267). However, Amanda acknowledged she is an addict, and she testified that though she would like to say that she would never use drugs again, she could not guarantee that she will never relapse. (July 30, 2020 Tr. at 291).

{¶40} Finally, evidence about Amanda's social life was also presented at the permanent-custody hearing. In January 2020, Amanda began living in an apartment in St. Marys after moving out of the shelter in Celina. Soon after moving into the apartment, Amanda began allowing an acquaintance named Jordan Helmstetter to stay with her. Although Amanda's apartment was not Helmstetter's primary

residence, Helmstetter stayed at Amanda's apartment most evenings. (July 30, 2020 Tr. at 273). According to Amanda, when she first allowed Helmstetter to stay at her apartment, she was unaware that Helmstetter had a criminal history and that he had previously served time in prison for drug trafficking. (July 30, 2020 Tr. at 274). Amanda testified that she learned about Helmstetter's criminal history at some point in January or February 2020, but that she continued to let Helmstetter stay at her apartment. (July 30, 2020 Tr. at 274-275). Amanda acknowledged that Helmstetter provided her with the methamphetamine that resulted in her positive drug tests in March and April 2020. (July 30, 2020 Tr. at 272-273). However, she stated that approximately one and a half to two months before the permanent-custody hearing, she stopped letting Helmstetter stay at her apartment after a "meth pipe" fell out of his pocket. (July 30, 2020 Tr. at 275). Amanda testified that she kicked Helmstetter out of her apartment because she wanted to better herself and because he was a bad influence. (July 30, 2020 Tr. at 276). She insisted that she no longer speaks to Helmstetter and that her relationship with him is "definitely over with." (July 30, 2020 Tr. at 272, 286).

{¶41} We conclude the trial court's findings under R.C. 2151.414(E)(1) are supported by clear and convincing evidence. Although S.S. and W.S. were removed from Amanda's custody only eight months before MCDJFS filed its motions for permanent custody, S.S. and W.S.'s removal, and the extent to which Amanda has

-23-

remedied the problem that caused their removal, cannot be viewed in a vacuum. Instead, Amanda's progress toward remedying the condition that led to S.S. and W.S.'s removal must be evaluated in light of the entire history of these cases, beginning with X.S., M.S., and G.S.'s removal in 2017.

{¶42} Since X.S., M.S., and G.S. were first removed from Amanda's custody in 2017, MCDJFS has consistently connected Amanda with counseling services, including, at times, specialized substance-abuse counseling. The record indicates Amanda failed to fully utilize the services offered to her during the early stages of these cases. When Amanda relapsed in August 2019, MCDJFS recommended that Amanda enter an inpatient drug treatment program. Amanda twice refused MCDJFS's suggestion. MCDJFS then provided Amanda with home-based therapy services through Foundations. Although Amanda's home-based therapist was not a substance-abuse specialist, Amanda's drug use and her plans for staying sober were frequently the focus of their counseling sessions. Thus, the record demonstrates that beginning in 2017 and continuing through S.S. and W.S.'s removal in August 2019 and the filing of the permanent-custody motions in April 2020, MCDJFS made considerable efforts to help Amanda address her substance-abuse issues.

{¶43} In spite of MCDJFS's efforts to help Amanda, as well as Amanda's own independent efforts with Momentum and the House of Hope, Amanda has not satisfactorily resolved her substance-abuse issues. Amanda has certainly made

-24-

some modest progress. Amanda appears to have maintained an extended period of sobriety in 2019, and even after she relapsed in August 2019, she tested negative for illegal drugs far more often than she tested positive. Nevertheless, Amanda has been unable to stop using drugs completely as required to allow S.S. and W.S. to return to her custody. Furthermore, at the time the motions for permanent custody were filed, Amanda had been effectively cohabiting for months with a felon who provided her with methamphetamine. While Amanda claimed she no longer associates with Helmstetter, this fact still reflects poorly on Amanda's commitment to addressing her substance-abuse issues.

{¶44} Finally, it is difficult to project when, if ever, Amanda will be able to put her substance-abuse issues behind her. Although Amanda intends to continue substance-abuse counseling with Lim and Lim expects Amanda to be cooperative going forward, Amanda is still in the early stages of her most recent attempt at substance-abuse counseling. Accordingly, while it is possible that Amanda may one day develop the skills she needs to cope with stress without resorting to drugs, the record does not establish that that day is imminent. The record simply does not support that S.S. and W.S. can be placed with Amanda in a drug-free home in the reasonably foreseeable future.

{¶45} Because the trial court's R.C. 2151.414(E)(1) findings are supported by clear and convincing evidence, the trial court did not err by finding under R.C.

2151.414(B)(1)(a) that S.S. and W.S. cannot be placed with Amanda within a reasonable time. Consequently, the trial court's decision to award permanent custody of S.S. and W.S. to MCDJFS is not against the manifest weight of the evidence.

{¶46} Amanda's first assignment of error is overruled.

**B. Amanda's Second Assignment of Error: Did MCDJFS submit adoption plans that fulfilled MCDJFS's obligations under R.C. 2151.413(E)?**

{¶47} In her second assignment of error, Amanda argues the trial court's decision granting permanent custody of the children to MCDJFS should be reversed because "the case plan was fatally defective and not in accordance with the laws of this state." Although Amanda acknowledges that MCDJFS submitted a proposed case plan for each child during the second day of the permanent-custody hearing on July 30, 2020, she claims the case plans did not include adoption plans sufficient to meet the requirements of R.C. 2151.413(E).

{¶48} R.C. 2151.413(E) provides that "[a]ny agency that files a motion for permanent custody under [R.C. 2151.413] shall include in the case plan of the child who is the subject of the motion, a specific plan of the agency's actions to seek an adoptive family for the child and to prepare the child for adoption." While R.C. 2151.413(E) requires an agency that files a motion for permanent custody to include an adoption plan in the child's case plan, "the statute does not include a 'temporal requirement' to state '*when* such an adoption plan must be added to the existing case

-26-

plan.'" (Emphasis sic.) *In re J.G.*, 9th Dist. Wayne No. 14CA0004, 2014-Ohio-2570, ¶ 8, quoting *In re T.R.*, 120 Ohio St.3d 136, 2008-Ohio-5219, ¶ 9-10. An adoption plan can be added to an existing case plan in accordance with the requirements of R.C. 2151.413(E) even after a motion for permanent custody has been granted. *See In re T.R.* at ¶ 12. Thus, while Amanda suggests that "the case plan for adoption * * * is required to be submitted alongside the motion for permanency," there is no such requirement, and MCDJFS could comply with its obligations under R.C. 2151.413(E) by submitting adoption plans at the permanent-custody hearing.

{¶49} However, Amanda's principal argument under her second assignment of error does not concern the timing of the submission of MCDJFS's adoption plans. Instead, Amanda challenges the content of MCDJFS's July 30, 2020 proposed case plans. Amanda observes that "the Department's case plan fails to document any efforts for permanency, but merely states 'the agency has requested PC for the boys.'" She further maintains that "[t]he case plan states no recruitment activities taken by the agency nor does it state recruitment efforts in finding the adoptive home." According to Amanda, "[l]ogic would assume the Department had intentions on the temporary custodians to be recruited as the adoptive parents; however, such a case plan fails to dictate any efforts on behalf of the Department."

{¶50} Amanda is correct to the extent that in sections of the case plans asking MCDJFS to "[d]ocument any steps taken to find an adoptive home, relative, legal guardian, or other permanent placement of the child," MCDJFS states only that it "requested PC for the boys." Yet, reading the proposed case plans in their entirety, it is evident that MCDJFS adequately detailed its adoption plans and efforts to locate suitable adoptive families for the children. First, each of the proposed case plans lists "Adoption" under a column titled "Child's Permanency Goal." Furthermore, the case plans indicate both that "[t]he boys will be matched with a family for adoption" and that "[t]he foster placements are both willing and able to keep the boys through adoption." Indeed, X.S., M.S., and G.S.'s foster parents and S.S. and W.S.'s foster parents all testified at the permanent-custody hearing that they desired to adopt their respective foster children if given the opportunity to do so. (*See* July 30, 2020 Tr. at 104-105, 125-126, 136-137, 149). Thus, MCDJFS's goal of adoption is manifest from the July 30, 2020 proposed case plans, and we conclude that MCDJFS therefore complied with the requirements of R.C. 2151.413(E). *See In re Cunningham Children*, 3d Dist. Seneca Nos. 13-08-27, 13-08-28, 13-08-29 and 13-08-30, 2008-Ohio-5938, ¶ 11.

{¶51} Amanda's second assignment of error is overruled.

**C.    Gabriel's First Assignment of Error:    Did the trial court err by approving and adopting MCDJFS's proposed amendments to Case Plan 1.02?**

**{¶52}** In his first assignment of error, Gabriel argues the trial court erred by approving and adopting MCDJFS's proposed amendments to Case Plan 1.02. Gabriel suggests that after his attorney lodged objections to MCDJFS's proposed amendments to Case Plan 1.02 at the November 5, 2019 case plan review hearing, the trial court was required to hold an additional hearing on the objections. He maintains that the trial court erred by approving and adopting MCDJFS's proposed amendments to Case Plan 1.02 without first conducting another hearing to specifically consider his objections.

**i.    Procedures for Amending Case Plans**

**{¶53}** "The procedures for the creation and amendment of a case plan are statutorily mandated." *In re S.D-M.*, 9th Dist. Summit Nos. 27148 and 27149, 2014-Ohio-1501, ¶ 26. Specifically, Ohio law does not permit substantive changes to a case plan "without recourse to the mandatory procedure set out in R.C. 2151.412[(F)](2)." *In re Townsend*, 4th Dist. Athens No. 04CA46, 2005-Ohio-2473, ¶ 30. R.C. 2151.412(F)(2) provides:

> (2)    Any party may propose a change to a substantive part of the case plan, including, but not limited to, the child's placement and the visitation rights of any party. A party proposing a change to the case plan shall file the proposed change with the court and give notice of the proposed change in writing before the end of the day after the day of filing it to all parties and the child's guardian ad litem. All parties and the guardian ad litem shall have seven days from the date the

notice is sent to object to and request a hearing on the proposed change.

(a) If it receives a timely request for a hearing, the court shall schedule a hearing pursuant to [R.C. 2151.417] to be held no later than thirty days after the request is received by the court. The court shall give notice of the date, time, and location of the hearing to all parties and the guardian ad litem. The agency may implement the proposed change after the hearing, if the court approves it. The agency shall not implement the proposed change unless it is approved by the court.

(b) If it does not receive a timely request for a hearing, the court may approve the proposed change without a hearing. If the court approves the proposed change without a hearing, it shall journalize the case plan with the change not later than fourteen days after the change is filed with the court. If the court does not approve the proposed change to the case plan, it shall schedule a hearing to be held pursuant to [R.C. 2151.417] no later than thirty days after the expiration of the fourteen-day time period and give notice of the date, time, and location of the hearing to all parties and the guardian ad litem of the child. If, despite the requirements of [R.C. 2151.412(F)(2)], the court neither approves and journalizes the proposed change nor conducts a hearing, the agency may implement the proposed change not earlier than fifteen days after it is submitted to the court.

R.C. 2151.412(F)(2)(a)-(b).

**ii.  The Objections to the Proposed Amendments to Case Plan 1.02**

{¶54} On October 29, 2019, MCDJFS filed a motion to approve amendments to Case Plan 1.02. The next day, the trial court filed a notice scheduling a case plan review hearing for November 5, 2019. There is no indication in the record that Gabriel or his attorney specifically requested the hearing. Furthermore, Gabriel did not file written objections to the proposed amendments, nor did he file his own proposed amendments in writing.

{¶55} On November 5, 2019, the case plan review hearing proceeded as scheduled. The record does not contain a transcript of the November 5, 2019 hearing. As a result, our only sources of information concerning Gabriel's objections are the trial court's November 22, 2019 judgment entries in which it approved and adopted MCDJFS's proposed amendments and journalized the amended case plan as Case Plan 1.03. The trial court's November 22, 2019 judgment entries provide:

> This 5th day of November 2019, this cause came on for hearing to approve the Case Plan, filed on October 29, 2019. * * * The Court reviewed the Plan with the parties. Following discussion with counsel, the Court noted objections to the Plan by [Gabriel's counsel], first that [Gabriel] wanted visits with the child[ren] to be unsupervised and second that he wanted visits to take place at his residence in the Village of Rockford, Ohio, on Saturdays between 12:00 p.m. and 4:00 p.m. Finally, [Gabriel] agreed to the drug testing provision, if it also took place at his Rockford residence. * * * Over the noted objections of [Gabriel's counsel], the Court approved the Case Plan as filed * * *.

**iii.  The trial court did not err by approving and adopting MCDJFS's proposed amendments to Case Plan 1.02.**

{¶56} As an initial matter, we find that Gabriel's "objections" to MCDJFS's proposed amendments were not objections as contemplated by R.C. 2151.412(F)(2). In reality, they were Gabriel's own proposed amendments to Case Plan 1.02. As relevant here, Case Plan 1.02 required Gabriel to submit to drug screening on Mondays and Thursdays at MCDJFS's facility. In its proposed amendments to Case Plan 1.02, MCDJFS did not ask that this requirement be modified. Thus, by

requesting that drug screening be performed at his residence in Rockford rather than at MCDJFS's facility, Gabriel was not objecting to a proposed change to Case Plan 1.02 so much as he was proposing an amendment of his own.

{¶57} Furthermore, under Case Plan 1.02, Gabriel was allowed two two-hour supervised visits per week with X.S., M.S., and G.S. at a neutral site. In its proposed amendments to Case Plan 1.02, MCDJFS suggested a visitation schedule that would allow Gabriel one two-hour supervised visit per week with X.S., M.S., and G.S. in an agency setting. By requesting that he be allowed one four-hour unsupervised visit per week with X.S., M.S., and G.S. at his residence in Rockford, Gabriel was not looking to preserve the status quo. Instead, Gabriel was proposing a plan of visitation that was not contemplated either in Case Plan 1.02 or in MCDJFS's proposed amendments to Case Plan 1.02. Consequently, Gabriel's "objections" are best described as proposed changes to Case Plan 1.02.

{¶58} Viewing Gabriel's "objections" as proposed amendments to Case Plan 1.02, we cannot say that the trial court erred by approving and adopting MCDJFS's proposed amendments without holding an additional hearing. Under R.C. 2151.412(F)(2), a party proposing a change to a case plan must file the proposed change with the court and give written notice of the proposed change to all parties and to the guardian ad litem. As far as we can discern from the record, Gabriel did neither of these things.

{¶59} Furthermore, Gabriel has not demonstrated that he was prejudiced by the trial court's failure to hold an additional hearing before adopting MCDJFS's proposed amendments to Case Plan 1.02. To begin, Gabriel was afforded an opportunity to be heard on his proposed changes to Case Plan 1.02. While Gabriel was not present at the November 5, 2019 case plan review hearing, his attorney was present to introduce the proposed changes and to advocate for their adoption.

{¶60} Moreover, it is far from clear that Gabriel would have been available to attend a separate hearing on his proposed changes or that he would have been able to assist his attorney in preparing for such a hearing. At the permanent-custody hearing, Gabriel testified that he left Ohio in August 2019 to seek work in Kentucky and Tennessee. (July 30, 2020 Tr. at 305-306). According to Gabriel, while he was in Kentucky and Tennessee, his phone "didn't hardly work at all, like, hardly ever." (July 30, 2020 Tr. at 330-331). He stated that he returned to Ohio sometime in December 2019, though the exact date of his return is unclear. (July 30, 2020 Tr. at 305-306). Thus, even if the trial court had scheduled an additional hearing for some time in early- or mid-December 2019, Gabriel has not established that he would have returned to Ohio to attend the hearing. *See* R.C. 2151.412(F)(2)(b) (requiring a trial court that does not approve a proposed change to schedule a hearing to be held no later than thirty days after the expiration of a fourteen-day period following the date the change is filed with the court). Accordingly, we conclude that the trial

court did not err by approving and adopting MCDJFS's proposed changes to Case Plan 1.02 without holding an additional hearing to consider Gabriel's proposed changes.

{¶61} Finally, we note that our conclusion would be the same even if Gabriel's "objections" were treated as actual objections to MCDJFS's proposed changes to Case Plan 1.02. First, there is authority suggesting that an oral objection to a case plan is not sufficient under R.C. 2151.412(F)(2). *See In re M.W.*, 8th Dist. Cuyahoga No. 83390, 2005-Ohio-1302, ¶ 44-45 (stating that "counsel had the obligation to formally object to the case plan and request a hearing" and implying that an oral objection to the elements of a case plan is not sufficient to satisfy this obligation). In addition, assuming that oral objections are sufficient under R.C. 2151.412(F)(2), it is unclear whether Gabriel actually invoked his right to a hearing under R.C. 2151.412(F)(2). Although the trial court's November 22, 2019 judgment entries demonstrate that Gabriel's attorney introduced the "objections" at the November 5, 2019 case plan review hearing, there is no transcript of the hearing in the record on appeal, so we are unable to ascertain whether Gabriel's attorney specifically requested a hearing on the "objections." This is significant because R.C. 2151.412(F)(2) "contemplates that a party who opposes a proposed change must request a hearing in order to be entitled to one." *In re K.W.*, 4th Dist. Highland Nos. 17CA7 and 17CA8, 2018-Ohio-1933, ¶ 50. Lastly, even if a request for a

hearing was made by counsel, for the reasons discussed in the two previous paragraphs, Gabriel has not established that he was prejudiced by the trial court's failure to hold an additional hearing. At the very least, Gabriel was afforded an opportunity to be heard on his objections at the November 5, 2019 hearing, though he chose not to attend this hearing. Thus, regardless of the way in which we view Gabriel's "objections," we conclude that the trial court did not err by approving and adopting MCDJFS's proposed amendments to Case Plan 1.02 without further hearing.

{¶62} Gabriel's first assignment of error is overruled.

**D.    Gabriel's Second Assignment of Error:  Did the trial court commit prejudicial error when it found that MCDJFS "made reasonable efforts with [Gabriel] to prevent the removal of the children and reunification"?**

{¶63} In his second assignment of error, Gabriel takes issue with the trial court's determination that MCDJFS made reasonable efforts both to prevent the removal of X.S., M.S., and G.S. and to reunite him with his children. Gabriel claims "[t]here was no finding by the trial court prior to the hearing on the permanent custody motion that the department made reasonable efforts to reunify the family" and that "[t]herefore, there was an obligation for the court to make a reasonable efforts determination." He does not dispute that the trial court made reasonable-efforts determinations in its judgment entries granting MCDJFS's motions for permanent custody, but he argues that the trial court's determinations are erroneous

because "the record does not support that the agency had reasonable case planning and used reasonable efforts to help him with the completion of the case plan."

### i.    Reasonable Efforts

**{¶64}** "[V]arious sections of the Revised Code refer to the agency's duty to make reasonable efforts to preserve or reunify the family unit," most notably R.C. 2151.419. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 29. Under R.C. 2151.419, when a trial court

> removes a child from the child's home or continues the removal of a child from the child's home, the court shall determine whether the public children services agency * * * has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home.

R.C. 2151.419(A)(1). R.C. 2151.419(A)(1) applies only at "'adjudicatory, emergency, detention, and temporary disposition hearings, and dispositional hearings for abused, neglected, or dependent children * * *.'" *In re N.R.S.*, 2018-Ohio-125, at ¶ 25, quoting *In re C.F.* at ¶ 41. R.C. 2151.419(A)(1) "makes no reference to a hearing on a motion for permanent custody." *In re C.F.* at ¶ 41. "Therefore, '[b]y its plain terms, the statute does not apply to motions for permanent custody brought pursuant to R.C. 2151.413, or to hearings held on such motions pursuant to R.C. 2151.414.'" *Id.*, quoting *In re A.C.*, 12th Dist. Clermont No. CA2004-05-041, 2004-Ohio-5531, ¶ 30. However, this does not relieve children services agencies of the duty to use reasonable efforts. *Id.* at ¶ 42. "If [an] agency

has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time."

*Id.* at ¶ 43.

**ii.     The trial court did not commit any prejudicial error with respect to finding that MCDJFS made reasonable efforts to reunify Gabriel with his children.**

{¶65} Gabriel maintains that the trial court was required to make reasonable-efforts determinations under R.C. 2151.419(A)(1) when it granted MCDJFS's motions for permanent custody because the trial court did not do so prior to the permanent-custody hearing. Gabriel is mistaken. The record establishes that the trial court made reasonable-efforts findings as required by R.C. 2151.419(A)(1) when the trial court returned X.S., M.S., and G.S. to the custody of MCDJFS in August 2019. As a result, the trial court was not required to make reasonable-efforts findings under R.C. 2151.419(A)(1) before granting MCDJFS's motions for permanent custody. *See In re C.F.* at ¶ 41-43.

{¶66} Because the trial court made reasonable-efforts findings under R.C. 2151.419(A)(1)  prior to the permanent-custody hearing, the reasonable-efforts findings in the trial court's judgment entries granting MCDJFS's motions for permanent custody are superfluous, and Gabriel was not prejudiced.[2]  Furthermore,

---

[2] We stress that this conclusion is based on the particular facts of this case where the trial court made reasonable-efforts findings under R.C. 2151.419(A)(1) and where Gabriel relied exclusively on R.C. 2151.419(A)(1) in making his arguments on appeal. In a different case, other sections of the Revised Code might require the trial court to make findings at the permanent-custody hearing concerning a children services

Gabriel does not challenge the trial court's other R.C. 2151.419(A)(1) reasonable-efforts findings even for plain error, and we decline to manufacture such an argument for him. *See In re L.R.*, 9th Dist. Summit Nos. 29266 and 29271, 2019-Ohio-2305, ¶ 18.

**{¶67}** Gabriel's second assignment of error is overruled.

## IV. Conclusion

**{¶68}** For the foregoing reasons, Gabriel's and Amanda's assignments of error are overruled. Having found no error prejudicial to the appellants herein in the particulars assigned and argued, we affirm the judgments of the Mercer County Court of Common Pleas, Juvenile Division.

*Judgments Affirmed*

**ZIMMERMAN and SHAW, J.J., concur.**

**/jlr**

---

agency's efforts to help the parents regain custody of their child. One such example is R.C. 2151.414(E)(1), which requires the trial court to "examine the 'reasonable case planning and diligent efforts by the agency to assist the parents' when considering whether the child cannot or should not be placed with the parent within a reasonable time." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, at ¶ 42. In cases where a trial court's "reasonable-efforts" findings are actually findings made pursuant to R.C. 2151.414(E)(1), error in those findings might be prejudicial depending on the facts of a given case.