[Cite as *In re B.F.*, 2021-Ohio-4251.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## PAULDING COUNTY

IN RE:

    B.F.,                                       CASE NO.  11-21-04

ADJUDICATED DEPENDENT CHILD.

[CHARLES F. - APPELLANT]                O P I N I O N
[BILLIE W. - APPELLANT]


**Appeal from Paulding County Common Pleas Court
Juvenile Division
Trial Court No. 20193014**

**Judgment Affirmed**

**Date of Decision:  December 6, 2021**


APPEARANCES:

    *Autumn D. Adams* **for Appellant-Father**

    *Alison Boggs* **for Appellant-Mother**

    *Matthew A. Miller* **for Appellee**

Case No. 11-21-04

**MILLER, J.**

{¶1} Mother-appellant, Billie W., and father-appellant, Charles F., appeal the April 29, 2021 judgment of the Paulding County Court of Common Pleas, Juvenile Division, granting permanent custody of their biological son, B.F., to appellee, Defiance-Paulding Consolidated Department of Job and Family Services (the "Agency"). For the reasons that follow, we affirm.

## I.    Facts & Procedural History

{¶2} B.F. was born in October 2019. Shortly after B.F.'s birth, the Agency received a complaint that Billie, Charles, and B.F. were living in a condemned home without running water, electricity, or other utilities. Following an investigation of the complaint, the trial court granted the Agency emergency custody of B.F. on October 28, 2019. The trial court's emergency order was filed on October 29, 2019.

{¶3} A shelter-care hearing was held on October 29, 2019, at which the trial court determined there was probable cause to find that B.F. was neglected and dependent. Consequently, via a November 1, 2019 judgment entry, the trial court continued B.F. in the Agency's temporary custody.

{¶4} On October 30, 2019, the Agency filed a complaint in the trial court alleging that B.F. was a neglected and dependent child. On November 1, 2019, the trial court appointed a guardian ad litem ("GAL") for B.F.

-2-

{¶5} At an adjudicatory hearing on November 25, 2019, the trial court found B.F. to be a dependent child under R.C. 2151.04(C). The trial court continued B.F. in the Agency's temporary custody pending disposition. The trial court's judgment entry of adjudication was filed on December 2, 2019. On December 4, 2019, case plans for Billie and Charles were filed with the trial court.

{¶6} A dispositional hearing was held on December 19, 2019. Via a December 20, 2019 judgment entry of disposition, the trial court continued B.F. in the Agency's temporary custody. Neither Billie nor Charles filed an appeal challenging B.F.'s adjudication and initial disposition.

{¶7} Throughout 2020, the trial court conducted several review hearings, each of which resulted in B.F. being continued in the Agency's temporary custody. Eventually, on November 4, 2020, the Agency filed a motion for permanent custody of B.F. The Agency later requested and was granted permission to withdraw its motion for permanent custody. On February 25, 2021, the Agency refiled its motion for permanent custody of B.F.

{¶8} A permanent-custody hearing was held on April 22, 2021. On April 29, 2021, the trial court granted the Agency's motion and awarded permanent custody of B.F. to the Agency.

Case No. 11-21-04

## II. Assignments of Error

{¶9} On May 4, 2021, Charles filed a notice of appeal. He raises the following three assignments of error for our review:

**1. It was an abuse of discretion to find reasonable efforts at removal were made when there were alternatives to removal available, and not used, and a free home was also found to be suitable but not used.**

**2. It was against the manifest weight of the evidence to find permanent custody was in B.F.'s best interest as [Charles] fully remedied the issue that caused B.F. to be removed and either completed or substantially complied with all remaining case plan services.**

**3. [Charles] suffered from ineffective assistance of counsel.**

On May 7, 2021, Billie filed her own separate notice of appeal. She raises the following three assignments of error for our review:

**1. The trial court's decision granting permanent custody was against the manifest weight of the evidence.**

**2. Appellant received ineffective assistance of counsel.**

**3. The agency failed to use reasonable efforts to reunify [Billie] with her son.**

There is considerable overlap between Charles's assignments of error and Billie's assignments of error. For ease of discussion, we will first address the challenges to the Agency's reasonable efforts to prevent removal of the child and facilitate return to the home. Then, we will consider the manifest weight of the evidence. Finally, we will address whether the parents received ineffective assistance of counsel.

-4-

### III. Discussion

**A. Charles's First & Billie's Third Assignments of Error: Did the trial court err by finding that the Agency made reasonable efforts to prevent B.F.'s removal, to eliminate the need for his continued removal, or to return him to the home?**

{¶10} In these two assignments of error, Charles and Billie argue the trial court erred by finding that the Agency used reasonable efforts to prevent B.F.'s removal from the home or to allow B.F. to return to the home. Charles's arguments focus on the early stages of this case and the Agency's efforts, or lack thereof, to prevent B.F.'s removal. Specifically, Charles maintains that by immediately placing B.F. into foster care, rather than allowing him and Billie to stay with B.F. in a hotel or placing B.F. with a family member or a suitable and willing family friend, the Agency did not make reasonable efforts to prevent B.F.'s removal. As for Billie, her arguments mirror Charles's, but she also contends that the Agency failed to use reasonable efforts to assist her in completing her case-plan objectives.

**i. Reasonable Efforts**

{¶11} "When the state intervenes to protect a child's health or safety, '[t]he state's efforts to resolve the threat to the child before removing the child or to permit the child to return home after the threat is removed are called "reasonable efforts."'" *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28, quoting Will L. Crossley, *Defining Reasonable Efforts: Demystifying the State's Burden Under Federal Child Protection Legislation*, 12 B.U.Pub.Int.L.J. 259, 260 (2003).

"'Reasonable efforts means that a children's services agency must act diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification.'" *In re H.M.K.*, 3d Dist. Wyandot Nos. 16-12-15 and 16-12-16, 2013-Ohio-4317, ¶ 95, quoting *In re D.A.*, 6th Dist. Lucas No. L-11-1197, 2012-Ohio-1104, ¶ 30. However, "'"[r]easonable efforts" does not mean all available efforts. Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible.'" *Id.*, quoting *In re M.A.P.*, 12th Dist. Butler Nos. CA2012-08-164 and CA2012-08-165, 2013-Ohio-655, ¶ 47. "[T]he meaning of 'reasonable efforts' 'will obviously vary with the circumstances of each individual case.'" *In re C.B.C.*, 4th Dist. Lawrence Nos. 15CA18 and 15CA19, 2016-Ohio-916, ¶ 76, quoting *Suter v. Artist M.*, 503 U.S. 347, 360, 112 S.Ct. 1360 (1992).

{¶12} "[V]arious sections of the Revised Code refer to the agency's duty to make reasonable efforts to preserve or reunify the family unit," most notably R.C. 2151.419. *In re C.F.* at ¶ 29. Under R.C. 2151.419, when a trial court

> removes a child from the child's home or continues the removal of a child from the child's home, the court shall determine whether the public children services agency * * * has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home.

R.C. 2151.419(A)(1). This statute applies at "'adjudicatory, emergency, detention, and temporary disposition hearings, and dispositional hearings for abused,

neglected, or dependent children * * *.'" *In re N.R.S.*, 3d Dist. Crawford Nos. 3-17-07, 3-17-08 and 3-17-09, 2018-Ohio-125, ¶ 25, quoting *In re C.F.* at ¶ 41. However, "'[b]y its plain terms, the statute does not apply to motions for permanent custody brought pursuant to R.C. 2151.413, or to hearings held on such motions pursuant to R.C. 2151.414.'" *In re C.F.* at ¶ 41, quoting *In re A.C.*, 12th Dist. Clermont No. CA2004-05-041, 2004-Ohio-5531, ¶ 30.

### ii. The Trial Court's Reasonable-Efforts Findings

{¶13} By our count, the trial court made no fewer than 11 reasonable-efforts findings during the pendency of this case. First, in the trial court's October 29, 2019 entry granting the Agency emergency custody of B.F., the trial court found that the Agency had made reasonable efforts to prevent B.F.'s removal from the home by "communicat[ing] with [Billie and Charles] regarding [B.F.'s] surroundings and regarding alternatives to the Agency seeking temporary custody." Then, in its November 1, 2019 judgment continuing B.F. in the Agency's temporary custody, the trial court again found that the Agency had made reasonable efforts to prevent B.F.'s removal. On this occasion, the trial court pointed to "attempts by the [Agency] to inspect the home, by investigating potential relatives and kinship placement options, and by commencing the background check process for a potential kinship placement."

{¶14} Next, in its December 2, 2019 judgment entry of adjudication, the trial court found that the Agency made reasonable efforts to eliminate the continued removal of B.F. These reasonable efforts included "communications and attempted communications with [Billie] and [Charles]; an attempted inspection of the interior of the residence; [and] facilitation of supervised visits between [Billie] and [Charles] and [B.F.]." The trial court also found that the Agency had used reasonable efforts in investigating relative or kinship placement options for B.F. Specifically, at the adjudicatory hearing, Mary K., an acquaintance of Billie and Charles, testified that she had prearranged with Billie for Billie and B.F. to stay at her house. Mary K. also stated that she passed the Agency's background test and drug screen. Nevertheless, the trial court noted that "due to safety concerns related to [Charles] knowing the whereabouts of [B.F.], the Agency has not placed [B.F.] in a relative or kinship home," including with Mary K.

{¶15} In its December 20, 2019 judgment entry of disposition, the trial court again found that the Agency had made reasonable efforts to eliminate the continued removal of B.F. This time, the trial court found that the Agency's reasonable efforts included "its case-planning efforts, communicating and attempting to communicate with [Billie] and [Charles], attempting to locate kinship placement options, attempting to inspect [Charles's] and [Billie's] residences, and scheduling visits between [B.F.] and [Billie] and [Charles]." The trial court also observed that the

Agency had made "diligent efforts to locate suitable grandparents or adult relatives of [B.F.]."

{¶16} Six review hearings were held between March 2020 and February 2021. After each of these review hearings, the trial court continued B.F. in the Agency's temporary custody after finding that the Agency had made reasonable efforts to eliminate the continued removal of B.F. These reasonable efforts included "the Agency's case-planning efforts," "communications and attempted communications" with Billie and Charles, "facilitating a Help Me Grow assessment for [B.F.]," "arranging for visits between [B.F.] and [Billie] and [Charles]," "attempting to verify [Billie] and [Charles's] residence," "arranging with the Montgomery County Department of Job and Family Services a courtesy home visit," and "providing [Charles] with information on where he may schedule his psychological assessment."

{¶17} Finally, in its April 29, 2021 judgment granting the Agency's motion for permanent custody, the trial court once again found that the Agency used reasonable efforts to eliminate the continued removal of B.F. and to make it possible for him to return safely home. The trial court found that the Agency had made reasonable efforts through its "case management services; referrals to providers; communications with [Billie] and [Charles]; answering [Billie's] and [Charles's] questions; monitoring the case plan; visiting with [B.F.] monthly; arranging visits

with the minor child for [Billie] and [Charles]; arranging with the Montgomery County, Ohio Department of Job and Family Services appropriate referrals and services; and reviewing photos and videos provided relevant to the case."

**iii. Charles and Billie cannot demonstrate reversible error with respect to any of the trial court's reasonable-efforts findings.**

{¶18} Charles and Billie allege that, at each phase of this case, the Agency failed to use reasonable efforts as required by R.C. 2151.419 and that the trial court erred by finding to the contrary. Yet, Charles and Billie are either foreclosed from challenging the trial court's reasonable-efforts findings or unable to demonstrate prejudicial error.

**a. Res judicata bars consideration of all of Charles's claims as well as some of Billie's claims.**

{¶19} Charles and Billie both take issue with the trial court's earliest reasonable-efforts findings. They maintain that the Agency did not have to immediately place B.F. in foster care and that it could have instead found a hotel for the family to stay in or permitted B.F. to stay with Mary K. Therefore, according to Charles and Billie, the trial court's first four reasonable-efforts findings (i.e., those in its October 29, November 1, December 2, and December 20, 2019 judgment entries) are erroneous because the Agency could have and should have done more to prevent B.F.'s removal.

{¶20} However, the time for making these arguments has long passed. "'An adjudication by a juvenile court that a child is "neglected" or "dependent" as defined by R.C. Chapter 2151 followed by a disposition awarding temporary custody to a public children services agency pursuant to R.C. 2151.353(A)(2) constitutes a "final order" * * * and is appealable to the court of appeals * * *.'" *In re H.F.*, 120 Ohio St.3d 499, 2008-Ohio-6810, ¶ 8, quoting *In re Murray*, 52 Ohio St.3d 155 (1990), syllabus. In this case, the trial court's first four reasonable-efforts findings either preceded or were contained within the trial court's judgment entries of adjudication and disposition. Consequently, any error in the trial court's first four reasonable-efforts findings could have been raised in a timely appeal from B.F.'s adjudication and initial disposition.

{¶21} But Charles and Billie failed to file any such appeal challenging B.F.'s adjudication and initial disposition. Res judicata bars litigation of "'a matter that was raised or could have been raised on direct appeal when a final, appealable order was issued in accordance with the law at the time.'" *In re L.S.*, 4th Dist. Ross No. 20CA3719, 2020-Ohio-5516, ¶ 20, quoting *State v. Griffin*, 138 Ohio St.3d 108, 2013-Ohio-5481, ¶ 3. Thus, because Charles and Billie could have raised their challenges to the trial court's first four reasonable-efforts findings on appeal from B.F.'s adjudication and initial disposition, res judicata now precludes Charles and Billie from making these arguments. *Id.* at ¶ 31 (holding that res judicata barred

parents from challenging reasonable-efforts findings in the trial court's shelter-care order because "the parents could have raised the issue in a direct appeal from the court's dispositional order"); *see In re T.K.M.*, 1st Dist. Hamilton No. C-190020, 2019-Ohio-5076, ¶ 25 (concluding that once the time for appealing child's adjudication and initial disposition had passed, "the issue was res judicata and father could not challenge the court's finding that the child was dependent and abused").

**b. Billie has not demonstrated plain error in any of the trial court's post-initial disposition reasonable-efforts findings.**

{¶22} Charles takes issue only with the trial court's first four reasonable-efforts findings. As a result, res judicata fully disposes of Charles's arguments. However, Billie challenges some of the trial court's post-initial disposition reasonable-efforts findings, specifically those finding that the Agency provided her with reasonable case-planning services.

{¶23} At the outset, we note that the scope of our review is significantly constrained. The trial court, in addition to incorporating reasonable-efforts findings into its judgment entries, announced its reasonable-efforts findings in open court at the end of five of the six review hearings. Yet, Billie never objected to any of the trial court's reasonable-efforts findings either at the review hearings or by subsequent filings. Billie thus "did not give the trial court an opportunity to consider her argument that [the Agency] failed to use reasonable efforts and to correct any deficiencies." *In re K.M.*, 4th Dist. Ross Nos. 19CA3677 and 19CA3678, 2019-

Ohio-4252, ¶ 39. As a result, absent plain error, Billie has forfeited her arguments for purposes of appeal. *Id.*

**{¶24}** "'In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself.'" *Id.* at ¶ 40, quoting *Goldfuss v. Davidson*, 79 Ohio St.3d 116 (1997), syllabus. "Moreover, plain error does not exist unless the court's obvious deviation from a legal rule affected the outcome of the proceeding." *Id.*

**{¶25}** After reviewing the record in this case, we conclude that Billie has failed to demonstrate plain error in any of the trial court's post-initial disposition reasonable-efforts findings. First, concerning the reasonable-efforts findings the trial court made following each of the six review hearings, there is ample support in the record for the trial court's findings. Billie specifically attacks the trial court's finding that the Agency's "case-planning efforts" were reasonable. Billie focuses in particular on the part of her case plan that required her to attend parenting classes. She notes that she thought she complied with this requirement when she attended and completed a three-hour parenting course, but the Agency did not believe the course was adequate. Billie maintains that the Agency should have communicated

this to her and given her a referral to a suitable course and that its failure to do so was unreasonable.

{¶26} Ideally, the Agency would have been clearer with Billie about its expectations concerning the parenting class. However, the parenting-class requirement was only one small part of Billie's case plan. In addition to requiring Billie to attend parenting classes, Billie's case plan also required her to establish safe, stable housing, to seek and maintain employment, and to undergo a mental health assessment and follow through with all post-assessment recommendations.

{¶27} The record establishes that the Agency attempted to assist Billie in accomplishing these objectives by giving her referrals to service providers and by coordinating with the Montgomery County Department of Job and Family Services ("Montgomery County JFS") when Billie relocated to Montgomery County. The record further demonstrates that when Billie moved to Montgomery County, Montgomery County JFS gave Billie housing and mental-health referrals and provided her with a resource booklet that listed "fifty to one-hundred places around Montgomery County that [could] help with food assistance, housing, [and] job searches." (Apr. 22, 2021 Tr. at 275). Despite these efforts, Billie had limited success in achieving her case-plan objectives, and in any event, "[a] parent's compliance is not determinative as to whether an agency has made reasonable efforts toward reunification." *In re Smith*, 3d Dist. Marion No. 9-04-35, 2005-Ohio-

149, ¶ 53. On balance, we do not find that the Agency's case-planning efforts were unreasonable, and we certainly do not find that the trial court's assessment of the Agency's efforts calls the legitimacy of the proceedings into question.

{¶28} Finally, with respect to the reasonable-efforts findings the trial court made in its judgment entry granting the Agency's motion for permanent custody, Billie cannot demonstrate prejudice. Because the trial court made reasonable-efforts findings under R.C. 2151.419(A)(1) prior to the permanent-custody hearing, the reasonable-efforts findings in the trial court's judgment entry granting the Agency's motion for permanent custody are superfluous, and Billie was not prejudiced. *In re X.S.*, 3d Dist. Mercer Nos. 10-20-09, 10-20-10, 10-20-11, 10-20-12 and 10-20-13, 2021-Ohio-1774, ¶ 66.

{¶29} Charles's first and Billie's third assignments of error are overruled.

**B.    Charles's Second & Billie's First Assignments of Error:  Is the trial court's decision awarding permanent custody of B.F. to the Agency against the manifest weight of the evidence?**

{¶30} In these assignments of error, Charles and Billie argue that the trial court's decision awarding the Agency permanent custody of B.F. is against the manifest weight of the evidence.

**i. Manifest-Weight Review of Permanent-Custody Decisions**

{¶31} "When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court '"weighs

the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.""" *In re Dn.R.*, 3d Dist. Shelby No. 17-20-06, 2020-Ohio-6794, ¶ 16, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115 (9th Dist.2001).

{¶32} In a permanent custody case, the ultimate question for a reviewing court is "whether the juvenile court's findings * * * were supported by clear and convincing evidence." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 43. "Clear and convincing evidence" is the "'measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.'" *In re Dn.R.* at ¶ 17, quoting *In re Estate of Haynes*, 25 Ohio St.3d 101, 104 (1986). "In determining whether a trial court based its decision upon clear and convincing evidence, 'a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof.'" *Id.* at ¶ 18, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990). "Thus, if the children

services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence." *In re R.M.*, 4th Dist. Athens Nos. 12CA43 and 12CA44, 2013-Ohio-3588, ¶ 55.

{¶33} "Reviewing courts should accord deference to the trial court's decision because the trial court has had the opportunity to observe the witnesses' demeanor, gestures, and voice inflections that cannot be conveyed to us through the written record." *In re S.D.*, 5th Dist. Stark No. 2016 CA 00124, 2016-Ohio-7057, ¶ 20. "A reviewing court should find a trial court's permanent custody decision against the manifest weight of the evidence only in the "'exceptional case in which the evidence weighs heavily against the [decision].'"" *In re Dn.R.* at ¶ 19, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

## ii. Standards & Procedures for the Termination of Parental Rights

{¶34} The right to raise one's child is a basic and essential right. *In re Murray*, 52 Ohio St.3d at 157, citing *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208 (1972) and *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625 (1923). "Parents have a 'fundamental liberty interest' in the care, custody, and management of the child." *Id.*, quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388

(1982). However, the rights and interests of a natural parent are not absolute. *In re Thomas*, 3d Dist. Hancock No. 5-03-08, 2003-Ohio-5885, ¶ 7. These rights may be terminated under appropriate circumstances and when the trial court has met all due process requirements. *In re Leveck*, 3d Dist. Hancock Nos. 5-02-52, 5-02-53 and 5-02-54, 2003-Ohio-1269, ¶ 6.

{¶35} "R.C. 2151.414 outlines the procedures that protect the interests of parents and children in a permanent custody proceeding." *In re N.R.S.*, 2018-Ohio-125, at ¶ 12, citing *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, ¶ 26. "When considering a motion for permanent custody of a child, the trial court must comply with the statutory requirements set forth in R.C. 2151.414." *In re A.M.*, 3d Dist. Marion No. 9-14-46, 2015-Ohio-2740, ¶ 13. "R.C. 2151.414(B)(1) establishes a two-part test for courts to apply when determining whether to grant a motion for permanent custody: (1) the trial court must find that one of the circumstances in R.C. 2151.414(B)(1)(a)-(e) applies, and (2) the trial court must find that permanent custody is in the best interest of the child." *In re Y.W.*, 3d Dist. Allen No. 1-16-60, 2017-Ohio-4218, ¶ 10.

{¶36} As relevant to this case, R.C. 2151.414(B)(1) provides:

> [T]he court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to [R.C. 2151.414(A)], by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

\* \* \*

(d)   The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period \* \* \*.

R.C. 2151.414(B)(1)(d).

**{¶37}** "'If the trial court determines that any provision enumerated in R.C. 2151.414(B)(1) applies,' it must proceed to the second prong of the test, which requires the trial court to 'determine, by clear and convincing evidence, whether granting the agency permanent custody of the child is in the child's best interest.'" *In re K.M.S.*, 3d Dist. Marion Nos. 9-15-37, 9-15-38 and 9-15-39, 2017-Ohio-142, ¶ 23, quoting *In re A.F.*, 3d Dist. Marion No. 9-11-27, 2012-Ohio-1137, ¶ 55 and citing R.C. 2151.414(B)(1). "The best interest determination is based on an analysis of R.C. 2151.414(D)." *Id.*

**{¶38}** "Under R.C. 2151.414(D)(1), the trial court is required to consider all relevant factors listed in that subdivision, as well as any other relevant factors." *Id.* at ¶ 24, citing *In re H.M.*, 3d Dist. Logan Nos. 8-13-11, 8-13-12 and 8-13-13, 2014-Ohio-755, ¶ 27. The factors specifically listed in R.C. 2151.414(D)(1) are:

(a)   The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b)   The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c)   The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d)   The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e)   Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1).  "Under this test, the trial court considers the totality of the circumstances when making its best interest determinations.  No single factor is given more weight than others." *In re N.R.S.*, 2018-Ohio-125, at ¶ 16.

**iii. The trial court's decision granting permanent custody of B.F. to the Agency is not against the manifest weight of the evidence.**

{¶39} Charles and Billie do not dispute that B.F. had been in the Agency's temporary custody for 12 or more months of a consecutive 22-month period at the time the Agency refiled its motion for permanent custody on February 25, 2021. Therefore, Charles and Billie do not challenge the trial court's determination that R.C. 2151.414(B)(1)(d) applies to B.F.  Instead, in these assignments of error, Charles and Billie argue the trial court erred by determining that permanent custody is in B.F.'s best interest.  However, after examining the trial court's best-interest

findings and reviewing the record, we conclude that clear and convincing evidence supports the trial court's best-interest determination.

**a. R.C. 2151.414(D)(1)(a)**

{¶40} With respect to R.C. 2151.414(D)(1)(a), the trial court found as follows:

> [B.F.] turned one year old [in October 2020]. [Billie] and [Charles] visit with [B.F.], and those visits go reasonably well; however, [Billie] and [Charles] are not closely bonded with [B.F.]. [B.F.] has resided with his foster family, which includes his half-brother, since he was approximately two months old. [B.F.] is closely bonded with his half-brother in the foster home and with his foster parents and other foster siblings. There are no blood relatives who could take custody of [B.F.].

(Doc. No. 105).

{¶41} At the permanent-custody hearing, Hillary Conley, an ongoing caseworker with the Agency, testified concerning B.F.'s interaction and interrelationship with Charles, Billie, and other persons who may significantly affect B.F. Conley stated that since B.F. was placed in the Agency's temporary custody, Charles and Billie had visited with B.F. on a fairly regular and consistent basis. Conley said that B.F.'s visits with Charles and Billie were appropriate, but that Charles would "comment that he was not understanding why [B.F.] would not come to him or it would take him 40 minutes to warm up to him." (Apr. 22, 2021 Tr. at 262-263). Regarding B.F.'s relationship with Charles's or Billie's friends or

family, Conley stated that although the Agency had looked into potential kinship placements during the early stages of the case, those placements were not approved and there were no kinship placements available for B.F.

{¶42} With respect to B.F.'s foster placement, Conley testified that B.F. "seems to be doing just fine" with his foster family, that he is "very happy," and that he is "very bonded" with his foster family. (Apr. 22, 2021 Tr. at 265). She stated that B.F. is placed in a foster home along with his half-brother and that they "actually share a room together and are very, very close with each other." (Apr. 22, 2021 Tr. at 251-252). Conley also said that B.F. is "very popular" with the other children in his foster home. (Apr. 22, 2021 Tr. at 266).

{¶43} In addition, Jennifer Porter, a Court Appointed Special Advocate, and Barry Schroeder, B.F.'s GAL, both submitted reports detailing B.F.'s interaction and interrelationship with Charles, Billie, and the other people with whom he has regular contact. In her reports, Porter explained that she observed Charles and Billie "meeting the needs of [B.F.] and engaging with him in an appropriate way." (Doc. Nos. 74, 99). Furthermore, she noted that during visitation, B.F. "sometimes cr[ied] and yell[ed] and reach[ed] for his foster parents" during the transition between his foster parents and Charles and Billie, but that Charles and Billie were "quick to redirect [B.F.] and help settle him." (Doc. No. 74). Porter stated that, in later visits, B.F. was better adjusted to the transitions and no longer cried when going to visit

Billie.  (Doc. No. 99).  Porter also explained that she observed B.F. playing with the other children in his foster home and that his foster parents "car[ed] for him in an appropriate way."  (Doc. Nos. 74, 99). In his reports, Schroeder observed that Charles and Billie's visits with B.F. went well and that it appeared that Charles and Billie genuinely love and care for B.F.  (Doc. Nos. 75, 101).  He also reported that B.F. is "well adapted with his foster family" and that a "significant and substantial bond exists and is evident with foster parents and [B.F.]."  (Doc. No. 75).

{¶44} Based on the foregoing, it is clear that B.F. has appropriate, meaningful relationships with those with whom he regularly interacts.  It is equally clear, however, that B.F. is more closely bonded with his foster family than he is with Charles and Billie and that B.F. apparently has no relationship with his extended biological family or with Charles and Billie's larger social network. Moreover, B.F.'s bond with his biological half-brother is in the nature of a sibling relationship notwithstanding that Billie's parental rights were terminated with respect to B.F.'s half-brother prior to B.F.'s birth.[1]  *See In re M.J.C.*, 2d Dist. Montgomery No. 28295, 2019-Ohio-2353, ¶ 17.  Thus, the record supports the trial court's findings under R.C. 2151.414(D)(1)(a).

**b. R.C. 2151.414(D)(1)(b)**

---

[1] We address this issue more thoroughly below in our discussion of the trial court's findings under R.C. 2151.414(D)(1)(e).

{¶45} Regarding R.C. 2151.414(D)(1)(b), the trial court found that B.F. "is 18 months old and is not of a sufficient age and maturity to articulate his wishes." (Doc. No. 105). At the permanent-custody hearing, Conley testified that B.F. was not able to talk as of the date of the hearing. Furthermore, in her two reports, Porter stated that B.F. "is an infant and unable to express his wishes." (Doc. Nos. 74, 99). Therefore, the record supports the trial court's findings under R.C. 2151.414(D)(1)(b).

c.     **R.C. 2151.414(D)(1)(c)**

{¶46} As to R.C. 2151.414(D)(1)(c), the trial court found as follows:

[B.F.] was briefly in the care of his parents from his birth * * * [until] October 28, 2019. From October 28, 2019 to present, the minor child has been in the temporary custody of the Agency. In approximately December 2019, when [B.F.] was two months old, through the present, [B.F.] has been in his current foster home. When the Agency filed its Motion for Permanent Custody on February 25, 2021, [B.F.] had been in the temporary custody of the Agency for 16 months.

(Doc. No. 105). It is undisputed that the Agency first gained temporary custody of B.F. on October 28, 2019 and that he remained in the Agency's temporary custody from that time through the date of the permanent-custody hearing on April 22, 2021. Moreover, at the permanent-custody hearing, Conley testified that B.F. entered his current foster home when he was approximately two months old. She testified that B.F. was moved from his original foster placement because the Agency "believed

-24-

he should be with his half-sibling." (Apr. 22, 2021 Tr. at 265). Consequently, the record supports the trial court's findings under R.C. 2151.414(D)(1)(c).

**d. R.C. 2151.414(D)(1)(d)**

{¶47} With respect to R.C. 2151.414(D)(1)(d), the trial court found as follows:

> [B.F.] is in need of a legally secure permanent placement. That type of placement cannot be achieved without a grant of permanent custody to the Agency. During the pendency of this case, [Billie] and [Charles] have not adequately addressed their mental and behavioral health issues. [Billie] and [Charles's] living situation, while appropriate in physical condition, is not stable, as [Billie] and [Charles] have both indicated to others multiple times during the pendency of the case that they would need to move out. While [Billie] and [Charles] have addressed some case plan areas—for example, by visiting regularly with [B.F.]—they have not sufficiently addressed the other areas of the case plan. [Billie] and [Charles] are not capable of providing [B.F.] with a legally secure permanent placement.

(Doc. No. 105).

{¶48} At the permanent-custody hearing, Conley testified that the problems necessitating B.F.'s removal from Charles and Billie's custody related to mental health, housing, and financial support. She testified Charles's and Billie's mental health issues were her "biggest concern." (Apr. 22, 2021 Tr. at 257). As to Charles, Conley stated that Charles had been previously diagnosed with a number of psychological disorders, including bipolar disorder and antisocial personality disorder. She also noted that Charles had "made a claim during a court hearing that he has the mind of a 12-year-old" and that he had displayed several concerning

-25-

behaviors, such as claiming that he was having a conversation with a then one-month-old B.F. (Apr. 22, 2021 Tr. at 243-244). Conley therefore required Charles to undergo a mental health assessment and follow through with the provider's treatment recommendations. She also required Charles to have a specific psychological assessment to evaluate his claim that he had the cognitive function of a 12-year-old.

{¶49} According to Conley, although Charles completed a mental health assessment in January 2020, he did not have any follow-up visits and "did not get back into any kind of mental health services until [August 2020]." (Apr. 22, 2021 Tr. at 244). She testified he had an appointment in August 2020 and two subsequent appointments with a psychologist, but that he left his last appointment in January 2021 "mid-meeting." (Apr. 22, 2021 Tr. at 244). Conley described Charles as being "very inconsistent" in addressing his mental health issues. (Apr. 22, 2021 Tr. at 244). Regarding the psychological assessment, Conley testified that Charles never completed the psychological assessment even though she "counted nine different providers that [she] provided to Charles to [complete] that sort of assessment." (Apr. 22, 2021 Tr. at 245).

{¶50} For his part, Charles explained that he had reached out to multiple offices and agencies to schedule appointments, but the providers either did not respond to his inquiries, did not notify him about appointments they scheduled for

him, declined to treat him, or did not accept Medicaid. He further stated he was addressing his mental health issues, and he maintained he had "followed through with every appointment that has been made." (Apr. 22, 2021 Tr. at 292). Charles noted that he had recently gone to a mental health appointment in March 2021 and that he had his psychological assessment scheduled for May 10, 2021.

{¶51} Conley stated that Billie was also directed to complete a mental health assessment. Conley testified that Billie completed the assessment in February 2020 as ordered, but that she did not follow through with individual counseling and case management as recommended by the service provider. Conley stated that Billie "says that she does not need mental health counseling." (Apr. 22, 2021 Tr. at 246). In her testimony, Billie confirmed she completed the mental health assessment, but she insisted that, after her assessment, she was told by the service provider that no counseling was recommended at that time. She also claimed she was unable to obtain a copy of the assessment, which explicitly set forth the provider's recommendation that she attend bi-weekly counseling. (Joint Ex. 1). Nonetheless, Billie stated she has consistently tried to schedule counseling appointments with various health care providers but that she has not been successful. She testified that despite having 10-15 contacts per month with mental health care providers from February 2020 through the date of the permanent-custody hearing, she was unable to set up an appointment.

{¶52} Regarding housing, Conley testified the Agency's initial concern was that Charles and Billie were living with B.F. in a condemned home with unremediated lead issues. The home also had "limited electricity, limited water, and limited heat." (Apr. 22, 2021 Tr. at 242). Conley stated Charles and Billie subsequently moved to Dayton, Ohio to live with Billie's sister and that Billie's sister's house was deemed to be safe and in appropriate physical condition. The house was also equipped with all essential utilities.

{¶53} However, Conley testified that she did not believe Charles and Billie's living situation was stable because "they [had] been asked to leave the house twice * * * during the course of this case." (Apr. 22, 2021 Tr. at 243). Indeed, Samantha Mathews, an ongoing caseworker with Montgomery County JFS, testified she received an email from Billie in November or December 2020 requesting immediate referrals to housing agencies because they were in danger of being "evicted" by Billie's sister. (Apr. 22, 2021 Tr. at 276). Mathews also stated that in January or February 2021, Charles indicated he had gotten into a disagreement with Billie's sister and that he might not be able to stay at the house any longer. Charles conceded that "there [had] been a couple issues where [there was] a possibility [they] could've been kicked out, but that was over minor disagreements" that had since been resolved. (Apr. 22, 2021 Tr. at 292). He testified that he and Billie would be staying with Billie's sister until they found suitable independent housing, for which Charles

claimed to be actively looking. Every witness, including Charles and Billie, acknowledged that Charles and Billie were staying with Billie's sister through Billie's sister's "goodwill" or on her "good graces." (Apr. 22, 2021 Tr. at 271, 281, 287, 313).

{¶54} Schroeder also expressed reservations regarding the stability of Charles and Billie's housing. In his report, Schroeder stated that "[o]f continued concern is the fact that [the] home is not stable in nature for the parents, due to the fact that they are not the leaseholders, and that they rely on an alternative income source to be able to live in the home." (Doc. No. 75). Charles testified that although he typically paid half of the household expenses, at the time of the permanent-custody hearing, he was paying 100 percent of the expenses, which amounted to about $450 per month. Billie testified that she contributed to the house by cleaning, cooking, doing laundry, and caring for her nephew when necessary.

{¶55} Finally, concerning employment, Conley testified Charles receives social security disability payments. Charles confirmed this, testifying that he received $514 per month but that he would eventually receive a larger monthly payment. With respect to Billie, Conley testified that Billie was required to "actively seek employment and provide [her] with verification of applying for employment." (Apr. 22, 2021 Tr. at 246). She stated that Billie told her that she "had applied for positions, but never got a call back or her background check didn't

come back suitable enough for that employer." (Apr. 22, 2021 Tr. at 246). Yet, Conley testified that Billie never provided her with any information that would allow her to "even call the employers to verify that she ha[d] put in an application or was going through any sort of training." (Apr. 22, 2021 Tr. at 246). She stated that Billie was not employed at any point during the case, though she was not aware of any reason why Billie could not be employed. Mathews similarly testified that she directed Billie to a temp agency that could assist her in her employment search, but she did not believe that Billie followed through with the agency. As with Conley, Billie told Mathews she was actively interviewing for jobs, but to Mathews's knowledge, Billie remained unemployed.

{¶56} Billie testified that she was still seeking employment and that although she was "putting in job application after application," she was not having success. (Apr. 22, 2021 Tr. at 313). She explained that she makes money by selling scrap metal and performing odd jobs for her neighbors. Billie stated that her income varied based on the price of scrap metal and the number of neighbors requiring her services. Charles testified that Billie can make "anywhere between $150 and $200" per week on average selling scrap metal. (Apr. 22, 2021 Tr. at 296-297).

{¶57} "'A legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's

-30-

needs.'" *In re K.M.*, 3d Dist. Crawford Nos. 3-18-11 and 3-18-12, 2018-Ohio-3711, ¶ 29, quoting *In re M.B.*, 4th Dist. Highland No. 15CA19, 2016-Ohio-793, ¶ 56. For Charles and Billie, providing B.F. with a legally secure permanent placement meant addressing their mental and behavioral health issues, establishing safe and stable housing, and showing the ability to bring in sufficient income to support themselves and B.F. However, the evidence supports that Charles and Billie failed to make sufficient improvement in any of these areas. Charles and Billie made little to no progress in addressing their mental and behavioral health issues. Furthermore, while Charles and Billie eventually established safe housing, given that they were not the leaseholders and that one or both of them had already faced the possibility of being ejected from the home, it lacks the requisite stability. Charles and Billie's housing situation is all the more precarious in light of the fact that Billie has been incapable of obtaining reliable employment. With Billie's fluctuating income and Charles's modest social security disability payments, Charles and Billie have only just managed to support themselves in a house where expenses are ordinarily shared between several occupants. It is uncertain how capable Charles and Billie will be of sustaining themselves, let alone themselves and B.F., should they no longer be permitted to reside with Billie's sister. Ultimately, by failing to adequately remedy the conditions that resulted in B.F.'s removal from their custody, Charles and Billie have not demonstrated that they are capable of dependably providing for B.F.'s

needs in a stable environment. Therefore, the record supports the trial court's findings under R.C. 2151.414(D)(1)(d).

**e. R.C. 2151.414(D)(1)(e)**

{¶58} Concerning R.C. 2151.414(D)(1)(e), the trial court found that "R.C. 2151.414(E)(11) is applicable as to [Billie] but not applicable as to [Charles]." (Doc. No. 105). Under R.C. 2151.414(E)(11), a trial court considers whether "[t]he parent has had parental rights involuntarily terminated with respect to a sibling of the child * * * and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child." Although the record does not establish that Charles had previously had his parental rights involuntarily terminated with respect to any of his other children, it does demonstrate that Billie had had her parental rights involuntarily terminated with respect to two of her other children—one in September 2017 and the other in July 2020. In addition, as stated in our discussion of the trial court's R.C. 2151.414(D)(1)(d) findings, Billie failed to prove that she could provide B.F. with adequate care and a legally secure permanent placement. Furthermore, R.C. 2151.414(E)(11) is applicable with respect to both of Billie's other children even though her rights to one of them were involuntarily terminated prior to B.F.'s birth.

*See In re M.J.C.*, 2019-Ohio-2353, at ¶ 17. Accordingly, the record supports the trial court's findings under R.C. 2151.414(D)(1)(e).

**f. Other Relevant Factors**

{¶59} In addressing other factors relevant to B.F.'s best interest, the trial court found as follows:

> Particularly relevant and concerning to the Court are [Billie's] and [Charles's] unaddressed mental and behavioral health issues. Those unaddressed mental and behavioral health issues would put the minor child at a substantial risk should the minor child be reunified with [Billie] and [Charles]. The Court does not find credible [Billie's] and [Charles's] testimony that they have done all they can to address their mental and behavioral health as required by the case plan. The Court understands that the COVID-19 pandemic interrupted some in-person services; however, as Ms. Mathews testified, behavioral health services were not halted during the pandemic. Rather, some services were made virtual rather than in-person. The Court believes [Billie] and [Charles] are, to be frank, hiding behind the excuse of the COVID-19 pandemic for not addressing their mental and behavioral health issues. The Court does not find credible [Billie's] and [Charles's] excuses for not adequately addressing their mental and behavioral health issues.

(Doc. No. 105).

{¶60} As we detailed above, Charles and Billie testified they were either unable to schedule appointments to address their mental and behavioral health issues or that they had tremendous difficulty doing so. They claimed the COVID-19 pandemic and a consequent shutdown of mental healthcare providers were largely to blame. However, the record belies this explanation. At the permanent-custody hearing, Mathews testified that Charles and Billie told her they were not receiving

-33-

any return calls from any of the mental health providers they contacted in Montgomery County. (Apr. 22, 2021 Tr. at 277). Yet, Mathews stated that the COVID-19 shutdown "didn't shut down any mental health services" in Montgomery County. (Apr. 22, 2021 Tr. at 277). She testified that most local mental health providers "remained open" and that "a lot of services took place over Zoom or over phone calls in lieu of face to face visits." (Apr. 22, 2021 Tr. at 277). Likewise, Conley testified "several clients on [her] case load [did not have] any interruption in mental health services" during the COVID-19 shutdown and that many of her clients were "able to get in sooner because of the tele-med that was starting and Zoom visits." (Apr. 22, 2021 Tr. at 262).

{¶61} Aside from their own testimonies, Charles and Billie offered no evidence to support their contention that they were repeatedly frustrated in their attempts to address their mental and behavioral health issues. As the trier of fact, the trial court was free to discount Charles's and Billie's testimonies, and after reviewing their testimonies, we do not find that the trial court's credibility determination was unreasonable. Thus, the record supports this finding as well.

{¶62} In sum, competent and credible evidence supports each of the trial court's best-interest findings. Considering the evidence of B.F.'s close bond with his half-brother and with his foster family, the length of time B.F. has been in the Agency's custody, Charles and Billie's failure to remedy the conditions that caused

B.F.'s removal, and all of the other factors reviewed above, clear and convincing evidence supports the trial court's determination that permanent custody is in B.F.'s best interest. Therefore, we conclude the trial court's decision awarding permanent custody of B.F. to the Agency is not against the manifest weight of the evidence.

**{¶63}** Charles's second and Billie's first assignments of error are overruled.

**C.     Charles's Third and Billie's Second Assignments of Error:  Did either Billie or Charles receive ineffective assistance of counsel?**

**{¶64}** In these assignments of error, Charles and Billie both argue that they received ineffective assistance of counsel.

**i.  Permanent Custody & Ineffective Assistance of Counsel**

**{¶65}** "In permanent custody proceedings, where parents face losing their children, we apply the same test as the test for ineffective assistance of counsel in criminal cases." *In re E.C.*, 3d Dist. Hancock No. 5-15-01, 2015-Ohio-2211, ¶ 40. A parent asserting a claim of ineffective assistance of counsel must establish (1) that counsel's performance was deficient or unreasonable under the circumstances and (2) that he was prejudiced by his counsel's deficient performance. *See State v. Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984).  In order to show counsel's conduct was deficient or unreasonable, the parent must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *See Strickland* at 689.

Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Frazier*, 61 Ohio St.3d 247, 255 (1991). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989).

{¶66} Prejudice results when "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Bradley* at 142, quoting *Strickland* at 694. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.*, quoting *Strickland* at 694.

**ii. Billie and Charles have both failed to demonstrate that they received ineffective assistance of counsel.**

{¶67} Charles and Billie each raise numerous instances of supposed ineffectiveness, and although they were represented by different counsel before the trial court, some of their claims are the same. Where their arguments overlap, we discuss them together.

**a. Failure to File Motion to Dismiss Original Motion for Permanent Custody**

{¶68} Billie argues that she received ineffective assistance of counsel because her trial counsel failed to file a motion to dismiss the Agency's original

November 4, 2020 motion for permanent custody. She argues that such a motion would have been successful because B.F. had not yet been in the Agency's temporary custody for 12 or more months of a consecutive 22-month period when the Agency filed its original motion for permanent custody. *See In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, ¶ 26 (holding that a child must be in an agency's temporary custody for at least 12 months of a consecutive 22-month period before the agency can move for permanent custody on R.C. 2151.414(B)(1)(d) grounds).

{¶69} While Billie is correct that the Agency's original motion for permanent custody was prematurely filed, she cannot demonstrate that she was prejudiced because the Agency was not awarded permanent custody of B.F. pursuant to the Agency's original motion. Instead, the Agency was awarded permanent custody of B.F. pursuant to the Agency's refiled motion for permanent custody. The Agency refiled its motion for permanent custody on February 25, 2021, by which time B.F. had been in the Agency's temporary custody for 12 or more months of a consecutive 22-month period. Thus, Billie has failed to show that there is a reasonable probability that the result of the proceedings would have been different if her trial counsel had moved to dismiss the Agency's original motion for permanent custody.

**b. Failure to File Motion for Extension of Agency's Temporary Custody**

{¶70} Billie argues her trial counsel was ineffective for failing to request an extension of the Agency's temporary custody of B.F. However, it is doubtful that Billie would even have had standing to request an extension of the Agency's temporary custody. *See In re A.C.B.*, 11th Dist. Portage Nos. 2016-P-0065 and 2016-P-0067, 2017-Ohio-4127, ¶ 34 ("Under R.C. 2151.415, there is no indication that a parent may file a request for an extension of temporary custody to the agency."). In any event, under R.C. 2151.415, a trial court is only authorized to grant an extension of temporary custody if "there has been significant progress on the case plan of the child." R.C. 2151.415(D)(1). As we have already explained, Billie failed to make significant progress on her case plan. Therefore, Billie has not demonstrated that her trial counsel was ineffective because she has not shown that counsel was even capable of obtaining an extension of the Agency's temporary custody of B.F.

**c. Failure to File Motion Requesting Family or Kinship Placement**

{¶71} Billie argues that her trial counsel was ineffective for failing to formally request that B.F. be placed with one of her sisters or with Mary K. Yet, there is nothing in the record indicating that Billie's sister would have been willing to take in B.F. or that her home would have been suitable for B.F. Furthermore, contrary to Billie's assertion, her trial counsel *did* expressly request that Mary K. be considered as a placement for B.F. At the dispositional hearing, Billie's trial

counsel asked that the court "look into having Mary [K.] be the placement option for [B.F.]" as Mary K. had "pass[ed] all of the Agency's background checks [and] drug testing." (Dec. 19, 2019 Tr. at 97). While the trial court did not order that B.F. be placed with Mary K., it did not rule out that such a placement might be possible in the future if Charles corrected the behavior-related safety concerns that made placement with Mary K. inappropriate. (*See* Dec. 19, 2019 Tr. at 97). Given that Billie's trial counsel did in fact ask the trial court to place B.F. with Mary K. and that Charles evidently failed to adequately resolve the concerns that rendered placement with Mary K. improper, Billie has not demonstrated that her trial counsel performed deficiently by not doing more to have B.F. placed with Mary K.

**d. Failure to Call Witnesses or Present Evidence Corroborating Testimony**

{¶72} Charles and Billie both argue that their respective trial attorneys were ineffective for failing to subpoena evidence or call additional witnesses to bolster their claims that they were doing everything they could to comply with their case plans. Billie argues her trial counsel was ineffective because "she failed to either call witnesses that would verify the attempts and work that [she] did on the case plan or present documentation that would further bolster [her] testimony." Similarly, Charles maintains that "testimony from the service providers [he] contacted about the complicated steps one must go through to make appointments in the COVID era and testimony about living in the Dayton home or copies of bills

-39-

[he paid] on the Dayton home would have helped support [his] claims." However, these arguments are simply too speculative to support their claims of ineffective assistance of counsel. Critically, Charles and Billie cannot establish this evidence even exists. And if it does exist, Charles and Billie have not shown precisely what information could be gleaned from it. Because we do not know whether this evidence exists or what we could expect to learn from it, we cannot determine whether Charles's and Billie's trial attorneys performed unreasonably by failing to present this evidence or whether Charles and Billie were prejudiced.

### e. Failure to File Motions for Expansion of Parenting Time

{¶73} Charles and Billie both contend that their respective trial attorneys were ineffective for failing to move for expanded parenting time with B.F. Charles, who articulates this argument most clearly, claims that by failing to file for more parenting time, they were "not able to show the skills [they] learned in parenting class and [they were] not able to try to create that closer bond" with B.F. Yet, even if Charles's and Billie's trial attorneys had performed unreasonably in this respect, Charles and Billie cannot demonstrate they were prejudiced. The parenting class requirement was but one component of Charles's and Billie's case plans, and Charles and Billie's bond with B.F. was but one factor relevant to B.F.'s best interest. Through expanded parenting time with B.F., Charles and Billie may have been able to develop a deeper bond with B.F. and show that the parenting class they

completed was sufficient to satisfy that requirement of their case plans. However, it would not change the fact that Charles and Billie substantially failed to satisfy the other requirements of their case plans. Nor would it negate the other factors supporting that permanent custody is in B.F.'s best interest. Based on the totality of the circumstances of this case, Charles and Billie have not shown that an expansion of their parenting time with B.F. would have resulted in this case ending with something other than a grant of permanent custody to the Agency.

**f. Failure to Object to Case Plan or File Motion to Amend Case Plan**

{¶74} Finally, Charles and Billie both argue that their respective trial attorneys were ineffective with respect to the case plans in this matter. Billie argues her trial counsel should have moved to "modify the case plan as [she] completed certain tasks." However, as we have covered in exhaustive detail throughout this opinion, Billie substantially failed to satisfy the objectives of her case plan. Accordingly, per the terms of Billie's argument, a modification of her case plan was never warranted.

{¶75} On the other hand, Charles argues his trial counsel was ineffective for failing to object to the requirement that he submit to a psychological assessment to evaluate his claim that he has the cognitive function of a 12-year-old. He maintains there "was no basis for the cognitive test" and that "the test was nothing more than an artificial barrier erected to make reunification that much harder." We disagree.

Our review of the record in this case reveals that, in addition to claiming he has the mind of a 12-year-old, Charles made several other bizarre, concerning statements over the course of this case. In addition, Charles was periodically belligerent during the proceedings, and on at least one occasion, he was removed from the virtual hearing because of his behavior. Thus, there is enough in the record supporting the possibility that Charles's cognitive capabilities are diminished. As a result, we conclude that he has not demonstrated his trial counsel likely would have succeeded in objecting to the psychological-assessment requirement. Furthermore, as the Agency notes, even if Charles had not been required to complete a psychological assessment, he still failed to satisfy the mental-health component of his case plan.

{¶76} Charles's third and Billie's second assignments of error are overruled.

## IV. Conclusion

{¶77} For the foregoing reasons, Charles's and Billie's assignments of error are overruled. Having found no error prejudicial to the appellants herein in the particulars assigned and argued, we affirm the judgment of the Paulding County Court of Common Pleas, Juvenile Division.

*Judgment Affirmed*

**ZIMMERMAN and SHAW, J.J., concur.**

**/jlr**